No. 25,218.

THE CITY OF SALINA, *Appellant,* v. THE SALINA STREET RAILWAY COMPANY, *Appellee.*

SYLLABUS BY THE COURT.

1. STREET RAILWAY COMPANY—*Must Operate Its Lines Continuously During the Life of Its Franchise.* Provisions of a city ordinance enacted pursuant to legislative authority, granting a street railway franchise, considered, and *held,* the grantee contracted to operate continuously during life of the franchise all lines constructed and put in operation pursuant to the franchise.

2. SAME—*Extension Lines Put in Operation Pursuant to the Franchise Must Also Be Operated Continuously During Life of Franchise.* The street railway company built an extension, operation of which proved unprofitable, and it was abandoned. The company still operates, by virtue of the franchise, 4.6 miles of railway. *Held,* operation of the extension may be compelled by mandamus.

Appeal from Saline district court; DALLAS GROVER, judge. Opinion filed November 10, 1923. Reversed.

*W. S. Norris,* and *A. R. Buzick, jr.,* both of Salina, for the appellant.
*David Ritchie,* and *Omer D. Smith,* both of Salina, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one of mandamus, to compel the railway company to operate a portion of its system. Judgment was rendered for the company, and the city appeals.

The company is assignee of E. S. Alnutt, who was granted a franchise to construct, maintain and operate a street railway system, by an ordinance adopted in 1906, under the provisions of section 2, chapter 121, of the Laws of 1905 (Gen. Stat. 1915; § 870), which reads as follows:

"Before any person, firm or corporation shall have the right to enter upon the streets, alleys, public parks and grounds of any city of the second or third class in the state of Kansas for the purpose of piping the same for gas, heat, light, water, or for the construction of any railways, street railways, sewerage system, telephones, or for any other purpose whatsoever, such person, firm or corporation must first procure the passage of an ordinance by the mayor and councilmen of such city granting unto such person, firm or corporation such right or rights, and in which said ordinance shall be defined fully and at length the terms upon which said right is conceded."

Pertinent portions of the ordinance follow:

"SECTION 1. That there be and hereby is granted to E. S. Alnutt, his heirs, successors, and assigns, for a period of twenty-five years from date of the ac-

City of Salina v. Street Railway Co.

ceptance hereof, the privilege and franchise to construct, operate and maintain a street railway system in the city of Salina, state of Kansas, and in the additions that now are or may hereafter exist in said city, for the transportation of passengers, express or freight along the streets over which railway lines may be constructed. . . .

"Sec. 6. That said E. S. Alnutt, his heirs, successors, or assigns, shall begin actual work within the corporate limits on said street railway within ninety days from the adoption of this ordinance, and shall have not less than one mile constructed in six months, and cars running on not less than four miles on one or more of the streets within twelve months from the adoption of this ordinance, and shall continuously operate said line during the life of this franchise. The first track laid shall be on Santa Fe avenue, from Kansas Wesleyan university to North street, thence west on North street to Ninth street, thence south on ninth street to Ash street, thence east on Ash street to Santa Fe avenue. E. S. Alnutt, his heirs, successors, and assigns, shall at all unpaved crossings put in suitable ballast, either boards, cement or suitable material to come flush with top of the rails, and all crossings where tracks are laid, and such crossings ballast to extend from rail to rail, and twelve inches on the outside of each rail, and from one side of the cross street to the other, and all such crossing ballast shall be maintained and kept in repair by E. S. Alnutt, his heirs, successors, and assigns, until such crossings may be paved. Said E. S. Alnutt, his heirs, successors, and assigns, shall operate the cars between the hours of six o'clock a. m. and eleven o'clock p. m., at intervals not greater than one-half hour, on each and every day during the life of this franchise, after the commencement of regular service, and on Santa Fe avenue at intervals not greater than one-fourth hour, and a failure so to do shall work a forfeiture of any and all rights herein granted."

"Sec. 16. If at any time after the expiration of two years the city council shall deem it necessary to the interests of the city to construct a street railway on any other streets of the city of Salina on which at the time there shall be no street railway in operation, and said city council shall give notice in writing to the said E. S. Alnutt, his successors and assigns, of a desire for said railway, and if the said E. S. Alnutt, his successors and assigns, shall fail to construct and operate a street railway on such street or streets within six months after the date of such notice, then the said E. S. Alnutt, his heirs, successors, or assigns, shall forfeit the right of way on such street or streets specified in said notice, provided that the said E. S. Alnutt, his heirs, successors, and assigns, shall not be required to construct more than two miles of new railway within any one year after receiving such notice.

"Sec. 17. If during the existence of this franchise the said E. S. Alnutt, his heirs, successors, and assigns, shall for any cause fail to run their cars over any portion of said railway tracks, or if any portion of such tracks shall be abandoned, or if, after the expiration of the grant of this franchise, the said E. S. Alnutt, his successors and assigns, shall cease to operate their cars in said city, they shall in either and all cases remove their tracks from the streets and public grounds of said city, and said streets shall be placed in thorough repair by the said E. S. Alnutt, his heirs, successors, and assigns.

"Sec. 19. Said E. S. Alnutt, his heirs, successors, and assigns, within thirty days from the adoption of this ordinance, shall file with the city clerk of this

city his acceptance of the privileges and rights of such franchise herein granted, subject to restrictions and qualifications herein mentioned."

The district court returned the following findings of fact:

"6. Within the time fixed by section 6 of the ordinance, the Santa Fe avenue line was constructed and in operation. Subsequently a line was constructed on Walnut street from Santa Fe avenue to Dry Creek, and on Eleventh street from Walnut street to Prescott avenue. In 1915, the East Side line—the line in question—was constructed. Part of this line runs through a business section of the city, but most of it winds through a residence quarter. It runs within a block of Oakdale and Kenwood Parks, where, from time to time, there are public amusements which are largely attended, such as baseball games, horse racing, automobile racing, and the like. Whenever there is a county fair it is held in one of these parks. About three-fourths of a mile beyond the eastern terminus of the line are the Salina country club, the Salina country club golf course, Marymount college, Mount Calvary cemetery, and Gypsum Hill cemetery. There is no other street car service in that part of the city, but the Santa Fe line runs within two blocks of Oakdale park.

"7. Since the construction of said East Side line, a large number of dwelling houses have been erected on that side, and other improvements have been made there, and if service on said line is permanently discontinued it will mean some depreciation in values in that part of the city. In 1922, the city expended about $6,000 in the improvement of Oakdale and Kenwood parks; and it is estimated that improvements planned for 1923 will cost $5,000.

"8. The first line of railway constructed under the ordinance ran by or near the passenger depots of the four railroads entering or running through Salina. In 1915, the union depot, located on Thirteenth street, was erected and opened for business, and the old passenger depots were abandoned. The part of the line on Santa Fe avenue north of Pine street, the parts on North street between Santa Fe avenue and Ninth street, and on Ninth street between North street and Bishop, proving unprofitable after the abandonment of the old depots, service to that extent was discontinued, and the tracks, aggregating 2,170 feet in length, were taken up by the defendant company. A line of railway was constructed on Bishop, Thirteenth, and Park streets, for the transportation of passengers to and from the union depot.

"9. The said East Side line has from the beginning been unprofitable. It has always been operated at a loss, but service on said line was continued in spite of the loss, the company hoping that a better patronage later on would render the line profitable. There is no testimony to show what the losses were during the first years of the existence of the line, but the evidence shows that during the year 1920 the line was operated at an average daily loss of $4.40. The average daily loss for 1921 was about the same; and for the year 1922 the average daily loss of operating this line was $5.83.

"10. On April 21, 1923, the street railway company ceased to run its cars over said line, and subsequently, at a meeting of the board of directors of the company, a resolution was passed directing the manager to take up and remove the rails and ties and to put the streets in repair.

"11. The Salina Street Railway Company has a capitalization of $156,500. In 1920 it declared a four per cent dividend; on May 1, 1921, a dividend of two per cent was declared; and on December 21st of that year it declared a dividend of six per cent. In 1922 there were two dividends, one of three per. cent in April, and another of two per cent in July. Up to this time no 1923 dividend has been declared.

"12. At the commencement of this action, four and six-tenths (4.6) miles of railway were in operation in Salina, exclusive of the said East Side line."

The controversy relates to the proper interpretation to be given the ordinance. The railway company says acceptance of the grant contained in the ordinance established a contract relationship between the company and the city. The company contends, however, the contract obligated it to construct and operate no more than four miles of street railway within the city, which obligation the company was fulfilling when the action was commenced; beyond construction and operation of four miles of track, the ordinance granted the company a mere privilege; should the company fail to exercise the privilege, the city might forfeit the privilege in the manner described in section 16; should the company exercise the privilege, the privilege might be renounced at any time; the company would then rest under the obligation created by section 17, to remove that portion of the track in excess of four miles which it abandoned, and put the street in repair. Having thus interpreted the ordinance, the company says mandamus does not lie to compel exercise of a privilege.

The company begins its argument by stressing section 1. It is said the section grants a privilege only. That section is not the ordinance. Following sections define the terms on which the concession was made, and a privilege cast may not be given to the entire ordinance by segregating and emphasizing section 1. The subject is referred to here because, in the company's brief, the fact that the company was under any obligation to construct or maintain a railway was admitted no further than the ambiguous expression "it seems" may imply.

When the company accepted the ordinance it became a contract for all purposes of this case. Construction of at least four miles of railway, beginning first with the track on Santa Fe avenue and the North street loop, was obligatory. Permission, or as the company designates it, privilege to construct and operate extensions on these streets and other streets was granted, and the privilege was extinguishable by the contract method described in section 16. When,

47—114 Kan.

however, the company chose to construct extensions or additions, whether pursuant to notice under section 16, or voluntarily, the privilege was consummated by exercise. Option to enjoy was closed by election to construct, and the company became bound by whatever obligation to operate attended acceptance of the terms of the ordinance.

This court is definitely committed to the doctrine that a street railway franchise is not granted for the benefit of the grantee, but for the benefit of the people of the city, and that acceptance of a franchise involves obligation to render the service contemplated by the grant, by operating constructed lines. (*City of Potwin Place v. Topeka Rly. Co.*, 51 Kan. 609, 33 Pac. 309.)

In the cited case, operation of tracks laid in Potwin pursuant to privilege to construct and operate was discontinued. The only mandatory provision of the ordinance was one relating to frequency of operation of cars. Counsel for the railway company contended its obligations were confined to those created by its charter, which did not require operation of a street railway in Potwin. The court said:

"Having accepted the rights and privileges conferred by the ordinance, we think the duty rests on them, in favor of the plaintiff city and its citizens, to render them the service for which the privilege was granted." (p. 614.)

The conclusion was, performance of the duty might be compelled by mandamus, whether the duty were regarded as a strictly contract obligation or an obligation implied by virtue of grant and acceptance of franchise.

The decision in the Potwin case was rendered in 1893. In 1905, the legislature enacted the statute quoted, requiring ordinances to define fully and at length the terms of public utility franchises. The contract nature of franchise ordinances had been more clearly discriminated than it was in 1893, and the purpose of the statute was to remove franchise privilege and obligation from the domain of implication and interpretation, and to place them as far as possible within the domain of expressed certainty. It is a rule of interpretation that public grants are construed most favorably to the public. To this rule was added the legislative direction that what was given should be specified. In this instance privilege to discontinue at will street-car service once extended, was not granted.

The company contends the subject of continuous service during life of the franchise was covered by the contract, and that, by the

provisions of section 6, such service was required in respect to the four miles of track to be in operation within the first year, and no more. The court concedes the subject of continuous service was included in the contract, but it cannot concede the proposed limitation. On the contrary, the court is constrained to hold that, considered in the light of the Potwin case, the statute, and the rule of interpretation referred to, the contract obligated the company to continue operation during life of the franchise of whatever lines it might choose to construct.

Section 6 jumbles a number of unrelated subjects. The first part of the section prescribes a time limit for minimum construction and operation, and nothing more—work to begin in 90 days; not less than a mile of track to be laid in six months; and cars to be running on not less than four miles of track on one or more streets within a year. The succeeding provision relating to continuous operation of "said line" during life of the franchise, could not refer to just four miles of track. The expression was "not less than four miles." The company might build 4.1, or 4.5, or 5 miles, and the requirement would certainly apply to all track placed in operation within the first year. It would be idle to contend the purpose was to limit the requirement of continuous operation to such track, whatever its length, as might be put in operation the first year. The expression "said line" could not refer to the Santa Fe avenue line and loop, because they had not yet been mentioned, nor to any particular street line of the "one or more streets," because none was specified. The only antecedent of "said line" is "said street railway," found at the beginning of the section, and "said street railway" refers to the street-railway system authorized by section 1. The provisions of section 6, relating to ballasting crossings and keeping crossings in repair, is clearly general. It governed construction of the East Salina extension when built. Likewise, the provision relating to intervals at which cars are to be operated is general. There must be thirty-minute service everywhere except on Santa Fe avenue, and fifteen-minute service on that street; and in view of the peculiar manner in which the section was framed, a specific design to make the provision for continued operation less general, cannot be attributed to the mayor and councilmen of the city.

The foregoing interpretation is confirmed by section 17. In the first sixteen sections of the ordinance, the subjects of location and grade of tracks, weight of rails, erection of poles, stringing of trolley

wires, paving of street intersections and repair of paved streets, building of culverts and drains, street obstructions, pattern, heating and sanitation of cars, fares and transfers, and other subjects are covered, which necessarily apply to all railway built and operated under the franchise. Throughout these sections the terms "said street railway," "said system of street railway," "the line of railway," "this railway," and other expressions are used, to denote generally whatever street railway the grantee of the franchise might install. Likewise the words "track," "tracks," "the tracks," "its tracks," and others, are used as referring to any track the company might lay. Then follows section 17, which clearly does not refer to the first four miles. If the company abandon or fail to operate cars over any portion of any track, it must remove its system of tracks from the streets and place the streets in repair. Permission to cease operating and to take up tracks constructed and put in operation, is clearly negatived.

The company says the action is not one of quo warranto, but one of mandamus, which is true. The resolution of the board of directors was not, however, to remove all its rails and ties from occupied streets, but those only of the East Salina extension; and so long as the company clings to part of the franchise, the city may require it to keep all franchise obligations.

The company suggests the city has given a fair operative interpretation to the ordinance by permitting removal of the north Santa Fe line and loop. This portion of the system was designed to serve the four railroad stations in the city when the system was installed. Building of the union station at Thirteenth street made reorganization of the street-railway system necessary, and the city has impliedly consented to the changes which the company made. Such consent did not, however, bind the company for life of the franchise to suffer other changes the company might make, and particularly changes which the city might consider detrimental to the public interest.

Finally, the company contends it may not be compelled to operate a line constructed pursuant to privilege, as distinguished from obligation, operation of which does not pay expenses. The distinction between construction and operation pursuant to obligation and pursuant to privilege, has already been dealt with. The court holds the company contracted to operate continuously during life of the franchise all tracks laid pursuant to the franchise. When the East Sa-

School District v. School Fund Commissioners.

lina extension was built, it became merged in the company's street-railway system. For its own information, the company may keep a profit and loss account of that extension, but the city is not concerned. Neither is the city concerned with the profit and loss account of the system as a whole. It has the company's contract to operate the system continuously during life of the franchise. The franchise is monopolistic in character. The company is intrenched in the heart of the city, and for the period of the franchise will have the cream of street-railway traffic. The provision for partial forfeiture unless the company make extensions after notice given under section 16, is of no value to the city. No company would build a side-street and outskirt railway, and two railway systems in the city would be a nuisance. A distinction should be made between service obligations of a company holding a local monopolistic franchise, and obligations of one which, as a matter of public policy, is expected to meet unlimited competition; and the rule that constitutional guaranties are infringed by compelling a railway corporation to operate at a loss, does not apply when operation is a positive requirement of the franchise and the company continues to assert rights under the franchise. (*Mo. Pac. Ry. Co. v. Kansas,* 216 U. S. 262; *Columbus Ry. & Power Co. v. Columbus,* 249 U. S. 399.)

The judgment of the district court is reversed, and the cause is remanded with direction to issue the peremptory writ.